IN the MATTER OF the ESTATE OF Helen V. SAFRAN:
Martin B. GEDLEN, Edward F. Gedlen and Roman
Safran, Appellants and Cross-Respondents,

v.

UNBORN CHILDREN OF Bernard V. SAFRAN, Jr., by their
guardian *ad litem,* Louis D. Kaiser, Respondents,

Bernard SAFRAN, Jr., Respondent and Cross-Appellant.†

Supreme Court

*No. 80–108. Argued March 2, 1981.—Decided June 2, 1981.*

(Also reported in 306 N.W.2d 27.)

For Martin G. Gedlen and Edward F. Gedlen there
were briefs by *Ewald L. Moerke, Jr., Dennis J. Mank*

---

† Motion for reconsideration denied, without costs, on July 6,
1981.

and *Schroeder, Gedlen, Riester & Moerke* of Milwaukee, and oral argument by *Ewald L. Moerke, Jr.*

For Roman Safran there were briefs by *George P. Kersten, Kevin M. O'Donnell* and *Kersten & McKinnon* of Milwaukee, and oral argument by *Mr. O'Donnell.*

For Unborn Children of Bernard V. Safran, Jr., there was a brief and oral argument by *Louis D. Kaiser* of Milwaukee.

For Bernard Safran, Jr., there were briefs by *Theodore J. Hodan* and *Fiorenza, Weiss, Amato, Hodan & Belongia, S.C.,* of Milwaukee, and oral argument by *Theodore J. Hodan.*

DAY, J.    This case is concerned with the disposition of the estate of Helen V. Safran. Her son, Bernard Safran, Jr., the principal beneficiary of her will, was convicted on a plea of no contest, of causing her death by reckless conduct in violation of sec. 940.06, Stats. (1975).[1]

The principal issues presented on appeal are:

1.   Does the beneficiary's commission of the offense of homicide by reckless conduct disqualify him from inheriting under the will?

2.   Is a judgment of conviction, following a plea of no contest, admissible in probate proceedings to show disqualification?

---

[1] "940.06.   **Homicide by reckless conduct.**  (1) Whoever causes the .death of another human being by reckless conduct may be fined not more than $2,500 or imprisoned not more than 5 years or both.

"(2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin."

We conclude that the criminal offense of reckless homicide does not by itself disqualify a beneficiary from inheritance and that a judgment of conviction for that offense is not admissible to show disqualification in a subsequent probate proceeding.

Other questions peculiar to the facts in this case will also be addressed in this opinion.

Mrs. Safran, a widow, died on July 11, 1977. On March 1, 1978, her son, Bernard Safran, was convicted of causing her death by reckless conduct, upon his plea of no contest.

On August 30, 1977, Mrs. Safran's will was admitted to probate. In her will, she gave all of her estate to her son Bernard, in trust.[2] In the event that Bernard predeceased Mrs. Safran without issue, the will provided that her estate be divided equally among her aunt, Clara Kobe, and her two brothers-in-law, Roman Saffron (a/k/a Safran) and Joseph Safran. At the time of Mrs. Safran's death, Roman Saffron was the only one of these alternate beneficiaries still living. Mrs. Safran was also survived by two heirs-at-law, her brothers, Martin B. Gedlen and Edward F. Gedlen. The brothers and the named beneficiary, Roman Saffron, entered into a stipulation on November 29, 1978, for the division of the estate in the event of Bernard Safran's disqualification.

In the course of the probate proceedings, petitions were filed on behalf of Roman Saffron, Edward F. Gedlen and Martin B. Gedlen, to disqualify Bernard from inheritance; for a construction of the will; for a deter-

---

[2] Under the terms of the trust, the trustee was to pay thirds of the trust to Bernard Safran on each of his twenty-third, twenty-sixth and thirty-fifth birthdays. In the event that Bernard died before receiving the full property clear of the trust, any remaining trust funds were to be paid to any issue of Bernard living at his death.

mination of devisees, legatees, heirs, next of kin and others; to disqualify Bernard from inheriting property held jointly with Mrs. Safran; and to sell real property held by the testatrix. Petitions and counter-petitions were filed on behalf of Bernard admitting his conviction for reckless homicide but denying culpability and requesting a trial on the question of whether Bernard caused his mother's death and did so with intent to kill.

A guardian *ad litem* was appointed to represent potential but unborn children of Bernard Safran. Such unborn children had a contingent interest in the testamentary trust established for Bernard in the will.

The trial court held Bernard Safran to be conclusively disqualified from inheritance by his conviction of reckless homicide. The trial court also ordered that the entire estate be held in trust for the benefit of any issue that might be born to Bernard Safran and in existence at the time of his death.

Martin B. Gedlen, Edward F. Gedlen and Roman Saffron filed a joint notice of appeal from the trial court order on January 14, 1980. A notice of cross-appeal was filed by Bernard Safran on March 19, 1980. The appeals were certified to this court by the court of appeals on November 21, 1980. The certification was accepted and the case accepted for review by this court on December 23, 1980.

■

The first question presented on appeals is: Does Bernard Safran's commission of the offense of homicide by reckless conduct disqualify him from inheriting under his mother's will?

The disqualification of a slayer is premised on the maxim: *Nullus commodum capere potest de injuria sua propria* (no one can attain advantage by his own wrong).

The trial court, in its memorandum decision, concluded that "a crime having the degree of criminal culpability attached to section 940.06 of the Wisconsin Statutes" is a sufficient basis for disqualification. The court correctly observed that Wisconsin has no statute on disqualification and that no decision of this court has involved "disqualification by reason of manslaughter or negligent homicide." The court's conclusion that the offense of reckless homicide was sufficient to disqualify was based on the general maxim that a criminal shall not be permitted to profit from his crime.

This court first considered the problem of a beneficiary killing a testator in *Estate of Wilkins*, 192 Wis. 111, 211 N.W. 652 (1927). While a part of the *Wilkins'* decision has since been overruled,[3] certain fundamental principles enunciated by the court remain. The court prefaced its conclusions on the effect of the murder with a discussion of the right to make a will.

"This sacred right to make a will rests entirely with the testator, who under our law can dispose of his property in accordance with his volition, excepting only as to certain rights which are extended by statute to a specified class of persons, designed for their protection as a matter of public policy. Under this exception comes the right of a widow to renounce the provisions of the will by accepting her statutory rights of dower. A testator may ignore wholly, if he desires, those in close relation to him by ties of blood, and he may bestow his devises and bequests upon persons who are ordinarily not deemed the objects of his bounty. Nor is any one permitted to make a will for him; neither can the courts change or modify a will, or substitute in its place one which they deem more equitable and just, for to permit this would destroy the sacredness of a will and would substitute in its place the will of another." *Estate of Wilkins, supra,* 192 Wis. at 113–114.

[3] *See* discussion *infra.*

The court went on to recognize that the power to make a will carries the implicit power to revoke the same. In *Estate of Wilkins,* the testatrix had been murdered by "K.," a $5,000 legatee under her will.

The court's conclusion that the will was inoperative as to the murderer was premised primarily on the equitable doctrine that a man shall not profit from his crime, but the court also recognized that:

"The sudden and unexpected killing of the testatrix by K. clearly effected a change in the condition of the testatrix. It deprived her of a valuable and sacred right, viz. the right to modify or change her will. The last sentence of the statute referred to reads: 'The power to make a will implies the power to revoke the same.' Here it must be reiterated that it was K. who deprived the testatrix of this sacred right to revoke her will, thus producing a changed situation not contemplated by the testatrix." *Estate of Wilkins, supra,* 192 Wis. at 120–121.

In *Estate of King,* 261 Wis. 266, 52 N.W.2d 885 (1952), the court considered the effect on the right of survivorship of the murder of one joint tenant by another. The court affirmed its view that, "no estate, in trust or otherwise, passes to the slayer upon the death of the slain." *Estate of King, supra,* 261 Wis. at 271.

In *Will of Wilson,* 5 Wis.2d 178, 92 N.W.2d 282 (1958), the court confronted a situation similar to the case at bar. There a husband, the sole beneficiary of his wife's estate, had murdered his wife. The court reiterated its firm commitment ". . . to the principle that a *murderer* will not be permitted to profit by his crime." *Will of Wilson, supra,* 5 Wis.2d at 180. (Emphasis added.) The court in *Will of Wilson* held, contrary to the view expressed in *Estate of Wilkins,* that the murderer may take under the will, but that he takes subject to a constructive trust imposed for the benefit of alternate beneficiaries. In so holding, the court rejected as error

the conclusion reached in *Estate of Wilkins* that a constructive trust would result in an unconstitutional attainder or corruption of blood by visiting "upon the criminal a punishment in addition to that provided for by law." *Will of Wilson, supra,* 5 Wis.2d at 182; (quoting *Estate of Wilkins, supra,* 192 Wis. at 118).

The constructive trust approach adopted in *Will of Wilson* is based upon the theory of unjust enrichment. It does not serve as an exception to the statutory provisions restricting the specific events that revoke a will. See, sec. 853.11(4), Stats. (1979–80). Instead, the murderer is compelled ". . . to surrender the profits of his crime and thus preventing his unjust enrichment." *Will of Wilson, supra,* 5 Wis.2d at 182; (quoting 4 Scott, *Trusts* (2d ed.), p. 3180, sec. 492).

As they apply to the instant case, these earlier cases establish the following:

(1) A murderer of a testator is disqualified from inheriting under the deceased's will.

(2) The mechanism for disqualification is the imposition of a constructive trust on the murderer for the benefit of alternate beneficiaries under the will.

(3) The imposition of the constructive trust is based on the doctrine that a criminal shall not be permitted to profit from his crime and because the act of the murder interferes with the right of the testator to modify his will.

Counsel for Bernard argues that this court should adopt the reasoning of the Supreme Court of Idaho in *Anstine v. Hawkins,* 92 Idaho 561, 447 P.2d 677 (1968). Idaho, like Wisconsin, has no statute concerning the effect of a slaying on descent. However, the Idaho statutes purport " '. . . to provide a complete system for succession to property of decedents' " in abrogation of the common law. *Anstine v. Hawkins, supra,* 92 Idaho at 563. The court therefore refused to apply the common law rule providing for the disqualification of a

slayer, and permitted one convicted of voluntary manslaughter to inherit the intestate estate of her slain husband. The court considered any "substantial change in public policy" to be the responsibility of the legislature.

We consider *Anstine v. Hawkins* unpersuasive. As *Estate of Wilkins* and *Will of Wilson* show, the common law rule that a murderer is disqualified from inheritance has been recognized in this state since 1927. As this court stated in *Estate of Wilkins, supra,* 192 Wis. at 119:

". . . this court in holding as it does in this opinion does not entrench upon the legislative field, but, on the contrary, its holding is in harmony with the spirit and intent of the legislature."

Bernard's counsel further argues that his conviction for homicide by reckless conduct does not disqualify him as a beneficiary under his mother's will. He observes that the cases of this court have disqualified only "murderers" and that his violation of sec. 940.06, Stats. 1975, is characterized in the statutes as a form of "homicide" but is not characterized as "murder." (Cf., secs. 940.01, 940.02 and 940.03, Stats. 1975, in effect at the time of the offense, which described the offenses of first, second and third-degree murder.) Bernard's counsel also argues that disqualification should not be triggered by a conviction for reckless homicide because the permissible punishment for that offense is significantly lesser than that for any of the degrees of "murder."[4]

---

[4] Under the 1975 statutes, which were in effect at the time of the offense, a conviction for first-degree murder carried a sentence of life imprisonment; a conviction for second-degree murder carried a sentence of five to twenty-five years; and a conviction for third-degree murder (felony murder), carried a sentence of not more than fifteen years in excess of the maximum penalty for the underlying felony. By contrast, conviction of reckless homicide carried a maximum fine of $2,500 or a sentence of not more than five years.

Finally, counsel for Bernard Safran argues that murder is an intentional act and that reckless homicide involves a degree of negligence but does not require intent.

Counsel for Martin B. Gedlen, Edward F. Gedlen and Roman Saffron, (the alternate beneficiaries) argue that a violation of sec. 940.06, Stats., is a proper basis for disqualification and that intent is an element of that offense. Counsel for Roman Saffron relies on the "key principle," that a criminal shall not profit by his own crime.

The alternate beneficiaries cite the opinion of the Supreme Court of North Carolina in *Quick v. Insurance Co.*, 287 N.C. 47, 213 S.E.2d 563 (1975). In that case, the beneficiary of a life insurance policy was convicted of involuntary manslaughter for the slaying of her husband (the insured). Under North Carolina statutes, a "slayer" was barred from acquiring any property from his victim, including property in the victim's estate or recoverable as a beneficiary of a life insurance policy. N.C. Gen. Stats. §31A–1 et seq.

Under the North Carolina statutory scheme, "slayer" was defined as one found to have "wilfully and unlawfully"[5] killed the decedent. N.C. Gen. Stats. §31A–3, (1966).

The court described the offense of involuntary manslaughter as:

". . . an unlawful killing without malice, without premeditation and deliberation, and 'without intention to kill or inflict serious bodily injury.' [citations omitted]. In many cases, the crime arises when the evidence tends to show that the actor's unlawful killing of the victim was caused by his unjustified and wanton or reckless use of a weapon in such a manner as to jeopardize the decedent's safety." *Quick v. Insurance Co.*, 287 N.C. at 53.

---

[5] This standard was drawn from the Model Statute proposed by Professor John Wade which is discussed below.

Because the offense did not involve an intentional killing, the court held that the statutory definition of a wilful killing was not met and that the disqualification statute could not apply. However, the court found that the statutory scheme did not completely supplant the common law principle ". . . that one should not be allowed to profit by his own wrong." *Quick v. Insurance Co., supra,* 287 N.C. at 54. The court concluded that disqualification of the slayer was proper:

". . . since the killing although unintentional, nonetheless resulted from her culpable negligence, that is conduct incompatible with a proper regard for human life. Culpable negligence proximately resulting in death comes within the purview of the common law maxim that no one shall be permitted to profit by his own wrong." *Quick v. Insurance Co., supra,* 287 N.C. at 59.

The public policy principle that no one should be permitted to profit by his own wrong has been said to be as old as equity itself. Annot., 36 A.L.R.2d 961 (1954). But it has been observed that public policy "is a very unruly horse, and once you get astride it you never know where it will carry you. It may lead you from sound law."[6]

We consider this case to present a more difficult problem than may be resolved by merely determining whether Bernard committed a crime. Rather, we must determine whether the character of his crime will disqualify him from inheritance under present Wisconsin law.

In *Estate of Wilkins, Estate of King,* and *Will of Wilson, supra,* the killer's act was described as "murder." In *Estate of Wilkins,* the court described the killing as a premeditated murder. In *Estate of Wilkins,* the court found no logical distinction ". . . between a case where

---

[6] Per Burrough, J., in *Richardson v. Mellish,* (1824) 2 Bing. 229, 252.

the murder is committed expressly for the purpose of coming into an untimely possession of a bequest or devise, and one where the offense is committed where the murderer has not this specific intent." *Estate of Wilkins, supra,* 192 Wis. at 118. Apart from that, this court has had no occasion to consider the nature of a homicide sufficient to disqualify the perpetrator from inheritance.

Some thirty states have statutes dealing with the problem of acquisition of property by the killing of another. Some of these statutes only apply to persons convicted of murder. Others are applicable to any intentional and felonious or unlawful killing. 5 Scott, *Trusts* (3d ed.), p. 3501, sec. 492.1.

As recently as the 1960's, Georgia and Virginia statutes barred the slayer from inheritance only if his motive for the killing was to obtain the victim's property.[7] Most of the authorities, however, concur with the view expressed in *Estate of Wilkins, supra,* 192 Wis. at 118, that such a motive is not essential to disqualification. McGovern, *Homicide And Succession To Property,* 68 Mich. L. Rev. 65, 80 (1969). While motive is not generally considered relevant to disqualification of a killer, intent to kill is deemed necessary to disqualify in most jurisdictions.

The Uniform Probate Code now adopted by thirteen states provides in sec. 2–803; p. 368:

"[Section 2–083]. [**Effect of Homicide on Intestate Succession, Wills, Joint Assets, Life Insurance and Beneficiary Designations.**] (a) A surviving spouse, heir or devisee who feloniously and intentionally kills the decedent is not entitled to any benefits under the will. . . ."

The official comment to that section states that:

---

[7] Ga. Code Ann. §§56–2506, 113–909 (1960); Va. Code Ann. §64.1–18 (1968).

"The section is confined to intentional and felonious homicide and excludes the accidental manslaughter killing." 8 U.L.A. Estate, Prob. & Related Laws 369 (1972).

The *Restatement of the law of restitution*, §187, similarly limits application of the constructive trust doctrine to "murderers" and the comment to that section states that it is inapplicable ". . . where the slayer was guilty only of manslaughter." *Restatement of the law of restitution*, Comment (*e*) at 767, (1936).

One formulation of a test of disqualification appeared in a proposed model statute drafted by Professor John W. Wade of the Harvard Law School. Wade, *Acquisition Of Property By Wilfully Killing Another—A Statutory Solution*, 49 Harv. L. Rev. 715 (1936). In Professor Wade's model statute, a "slayer" is disqualified. The type of killing that effects disqualification under that formulation is controlled by the definition of "slayer," that is:

". . . Any person who wilfully and unlawfully takes or procures to be taken the life of another." 49 Harv. Law Rev. at 721–722.

In his discussion of this definition, Professor Wade states:

"The definition of the term 'slayer' is particularly important, since it signifies what kind of killing disqualifies a man from acquiring property. The requirement that the killing be wilful and unlawful cannot be said to be the only possible rule; in fact, it 'is futile to attempt to arrive at a "true rule" by pure logic.' But a line must be drawn at some place. Should a statute of this sort include manslaughter? The answer is doubtful, but it is believed that it should not, if the killing is involuntary. *If the wrong was not intentional, it is difficult to say as a matter of policy that the perpetrator should be prohibited from acquiring property.* But the decision being one of policy, each individual is entitled

to his own opinion; and it may be urged that it would be sufficient to require the slaying to be felonious, and thus include manslaughter, in some of its degrees at least." *Wade, supra,* 49 Harv. L. Rev. at 722. (Emphasis added.)

This standard, requiring intent to kill, was applied in *Estate of Mahoney,* 126 Vt. 31, 220 A.2d 475 (1966). In that case, the Supreme Court of Vermont stated:

"It is the intent to kill, which when accomplished, leads to the profit of the slayer that brings into play the constructive trust to prevent the unjust enrichment of the slayer by reason of his intentional killing." *Estate of Mahoney,* 220 A.2d at 478.

We concede, with Professor Wade, that a "true rule" cannot be divined by "pure logic." Our earlier cases have held only that an intentional killer shall be disqualified from inheritance. In Chapter 339, Laws of 1969, the legislature substantially revised the Wisconsin Probate Code. That legislation did modify the provisions governing the revocation of wills, but neither rejected nor extended this court's standard for disqualification of a killer. We consider this failure to modify or extend the rule to reflect a legislative intent to limit disqualification to intentional killers. If that rule is to be extended to include some of the degrees of negligent homicide, that change should be made by the legislature.[8]

Roman Saffron contends, however, that the crime Bernard was convicted of "constituted an intentional killing of his mother." If this were true, there would be no distinction between first-degree murder and homi-

---

[8] For example, homicide by negligent use of a motor vehicle is a felony in this state. See sec. 940.08, Stats. 1979–80, set out at footnote 9, below. This is a crime that does not require intent to kill or even wilful or wanton disregard of the rights of another. If this conduct is to disqualify, that public policy should be established by the legislature.

cide by reckless conduct. But that is emphatically not the case.

Sec. 940.06(2), Stats., 1979–80, defines reckless conduct as:

". . . an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin."

On its face, this definition involves no element of intent to kill. Roman Saffron cites the case of *Hart v. State,* 75 Wis.2d 371, 249 N.W.2d 810 (1977), for the proposition that intent is a requirement of gross negligence (which is incorporated by reference to sec. 940.-06(2), Stats.).

In *Hart v. State,* the court reviewed, on a writ of error, the conviction of an automobile driver under sec. 940.08, Stats. 1975.[9] In the course of discussing that statute, the court discussed the nature of gross negligence under the reckless homicide statute. The court stated, that:

"Gross negligence (which is now incorporated in sec. 940.06, Stats., Homicide by Reckless Conduct) requires a subjective intent as an element of the offense. In *Bussard* and *Clemens,* the court used the following definition of gross negligence from *Jorgenson v. Chicago & N.W. Ry.,* 153 Wis. 108, 116, 140 N.W. 1088 (1913):

---

[9] "940.08. **Homicide by negligent use of vehicle or weapon.** (1) Whoever causes the death of another human being by a high degree of negligence in the operation or handling of a vehicle, firearm, airgun, knife or bow and arrow is guilty of a Class E felony.

"(2) A high degree of negligence is conduct which demonstrates ordinary negligence to a high degree, consisting of an act which the person should realize creates a situation of unreasonable risk and high probability of death or great bodily harm to another."

" '. . . Gross negligence has received a very certain and definite meaning in the jurisprudence of this state. . . . It is not inadvertence in any degree; there must be present either wilful intent to injure or that wanton and reckless disregard of the rights of others and the consequences of the act to himself as well as to others which the law deems equivalent to an intent to injure.' " *Hart v. State, supra,* 75 Wis.2d at 380.

The only "intent" referred to in the cited case of *Jorgenson v. Chicago & N.W. Ry.,* is an intent to injure. It is incorrect to conclude from *Hart* that "intent to kill" is a required element of reckless homicide. It is true that reckless or wanton disregard of the rights of others may be deemed "equivalent to an intent to injure." But the dicta in *Hart v. State* that reckless homicide "requires a subjective intent as an element of the offense" is incorrect and is withdrawn. A "subjective intent" is one framed in the mind of the actor. No subjective intent element must be proven by the state in a reckless homicide prosecution.

The correct rule is stated in *Hayzes v. State,* 64 Wis. 2d 189, 198, 218 N.W.2d 717 (1974) :

"Both secs. 940.05(1) and 940.06, Stats., are degrees of negligent homicide. That is, where the death was caused *without the intent to commit bodily harm,* but the conduct of the actor was such that there was a high probability that someone would be killed or injured." (emphasis added). Quoted with approval in *Werner v. State,* 66 Wis.2d 736, 746, 226 N.W.2d 402 (1975).

The second question is: Is a judgment of conviction following a plea of no contest admissible in probate proceedings to show disqualification?

The trial court held that while a *plea* of no contest to a criminal charge is inadmissible in a subsequent civil action, a criminal *conviction* is not. The court further

held Bernard Safran's conviction of reckless homicide was conclusive evidence of disqualification.

The court observed that the majority rule is against admissibility of a criminal conviction in a subsequent civil proceeding. But, finding no Wisconsin cases directly in point, followed the "trend" toward abandoning the exclusionary rule.

Bernard Safran, by his counsel, argues that admitting the conviction into evidence was error. He relies primarily on sec. 904.10, Stats. 1979–80, which provides:

'904.10. **Offer to plead guilty; no contest; withdrawn plea of guilty.** Evidence of a plea of guilty, later withdrawn, or a plea of no contest, or of an offer to the court or prosecuting attorney to plead guilty or no contest to the crime charged or any other crime, or in civil forfeiture actions, is not admissible in any civil or criminal proceeding against the person who made the plea or offer or one liable for his conduct. Evidence of statements made in court or to the prosecuting attorney in connection with any of the foregoing pleas or offers is not admissible."

Unless that statute is construed to bar both the plea of no contest and the judgment of conviction that follows, Bernard Safran argues that this statute is meaningless.

We disagree with that analysis, and believe the trial court properly distinguished the plea of no contest from the judgment of conviction that follows.

But we hold that the court did err in admitting the conviction. This is so, because a criminal conviction, whether based on a plea of no contest or upon a verdict of guilty, is generally not admissible in a subsequent civil action. Sec. 904.10, Stats., was aimed at protecting persons convicted of criminal offenses against use of a plea of no contest in a later civil proceeding. This is because that plea is not an admission of guilt. The

statute supplements the rule that a criminal conviction is inadmissible, by additionally excluding evidence of a plea which infers a concession of guilt.

The rule excluding convictions is described in 29 Am. Jur.2d, *Evidence,* §334 (1967):

"It has been a traditional rule that a judgment of conviction in a criminal prosecution is not admissible in a civil case, as evidence of the facts upon which it was based. Various reasons have been assigned for this rule, it having been variously held, as a foundation for the rule, that there is a dissimilarity in objects, issues, results, procedures, and parties in the two actions, as well as a lack of mutuality. Moreover, it has been frequently pointed out that different rules of evidence apply, not only as to elements of proof, degree of proof, and weight of evidence, but also to the competency of witnesses.

"Although a majority of jurisdictions continue to recognize the rule excluding, in civil actions, evidence of criminal convictions offered to prove the facts upon which they were based, there has been a considerable amount of criticism of the reasoning upon which the rule is founded, and a trend in favor of the admission of such evidence is observable. Generally, where admitted, the prior conviction has been regarded as prima facie evidence of the issue involved, although in some instances the judgment has been regarded as conclusive as to the facts adjudicated. Some decisions indicate a tendency to limit the admissibility of previous convictions to the situation where the criminal is attempting to enforce a right arising from the crime, but others have regarded the rule of admissibility as a general one, not turning upon the type of action involved. In some situations statutes have provided for the admission of criminal convictions as evidence of guilt in subsequent civil actions involving the same facts."

The majority view in favor of exclusion was acknowledged by this court in *State ex rel. Shea v. Evenson,* 159 Wis. 623, 150 N.W. 984 (1915).

That case was a *quo warranto* action to try the winning candidate's (Evenson's) title to the office of town chairman. The relator (Shea) offered in evidence the record of a criminal action in which Evenson was found to have converted town funds to his own use and was therefore removed from public office. On appeal, Evenson challenged the admissibility of the findings and order of removal.

This court stated that the criminal record was not evidence of the facts found in the removal proceeding. The court stated that:

"The present is substantially a civil action between two citizens to determine the title to office. *It is well established that a judgment in a criminal action is not proof of anything in a later civil action, except of the fact of conviction and the legal consequences flowing therefrom.* It cannot be given in evidence to establish the truth of the fact on which it was rendered. . . . It is doubtless conclusive proof of the fact of the removal, but in another action between other parties it is not evidence of the facts on which the removal was based." *State ex rel. Shea v. Evenson, supra,* 159 Wis. at 626. (Emphasis added.)

*Lee v. State Board of Dental Examiners,* 29 Wis.2d 330, 139 N.W.2d 61 (1966), is an example of a case in which a criminal conviction was admissible to show "the fact of conviction and the legal consequences flowing therefrom."

In *Lee v. State Board of Dental Examiners,* a civil action was brought by the State Board of Dental Examiners to revoke the license of a dentist (Dr. Lee), for violations of the Federal Food, Drug and Cosmetic Act.[10] Dr. Lee had been convicted upon a plea of *nolo contendere* of two counts of violations of the Act. By statute,[11] the

---

[10] 21 U.S.C. secs. 331(2) and 352(a).

[11] Sec. 152.07(2), Stats. 1961. "Revocation . . . . (2) The board may suspend or revoke the license of one convicted of a crime involving moral turpitude, of which the record of conviction, or a

board was empowered to revoke a dentist's license upon his conviction of a crime involving moral turpitude. On appeal from a circuit court review of the board's revocation of Dr. Lee's license, Lee argued that despite the statute, his conviction could not be considered in the revocation proceeding because it was based on a plea of *nolo contendere.*

The court stated that:

"A Judgment of conviction based on a plea of *nolo contendere* is a conviction which contains all of the consequences of a conviction based on a plea of guilty or a verdict of guilty. There is no difference in the nature, character or force of a judgment of conviction depending on the nature of the underlying plea." *Lee v. State Board of Dental Examiners,* 29 Wis.2d at 335.

Because the statute involved in *Lee v. State Board of Dental Examiners* provided that the *fact* of conviction was conclusive to empower the board to revoke Dr. Lee's license, the conviction was properly admissible. Where a statute, like that involved in *Lee v. State Board of Dental Examiners,* provides its own evidentiary standards permitting use of a criminal conviction, the common law rule excluding criminal convictions is excepted, regardless of the underlying plea.

Wisconsin has no statute disqualifying a person convicted of reckless homicide from benefiting from the estate of his victim. However, the common law of this state does disqualify one who intentionally and unlawfully kills a testator. In *Will of Wilson, supra,* this court implicitly recognized an exception to the exclusionary rule where a judgment of conviction represents each of the elements of that test, as a first-degree murder conviction does. In that situation, the conviction follows findings of fact, made beyond a reasonable doubt, on pre-

copy certified by the clerk or judge of the court, and shall be conclusive evidence."

cisely the question to be resolved by a probate court considering disqualification. That is: Did the beneficiary unlawfully kill the testator, with the intent to kill? The fact of such a conviction conclusively establishes disqualification.

But a conviction of reckless homicide represents findings of fact on a very different question and is therefore not excepted from the general rule excluding a criminal conviction in a subsequent civil action.

We conclude that this case should be remanded. In the proceedings on remand, it must be proven that Bernard Safran unlawfully and intentionally killed his mother in order to cut off his rights under the will. Because the acts in question constitute a crime, those facts must be proven by "clear and convincing" evidence. *Jonas v. Northeastern Mut. Fire Ins. Co.*, 44 Wis.2d 347, 353, 171 N.W.2d 185 (1969). If proof of disqualification is made by clear and convincing evidence, a constructive trust must be imposed for the benefit of the alternate beneficiaries.

We are left with three final problems concerning the disposition of Mrs. Safran's estate, if Bernard Safran is found to be a constructive trustee *ex malificio*.

First, the trial court held that the entirety of the estate must be maintained for the benefit of any issue which may be born of Bernard Safran, in accordance with the terms of the testamentary trust under Mrs. Safran's will. Second, the court authorized payments from the trust to Bernard during his lifetime to prevent him from becoming a public charge. Third, the court ordered that property jointly held by Bernard and his mother be equally divided as of the date of Mrs. Safran's death as between Bernard and his mother.

On the first question, the trial court held that the constructive trust doctrine was inapplicable to this case be-

cause the will established an express trust for the benefit of any issue of Bernard in existence at the time of his death. This ruling was in error.

It is clear under the terms of the will that Bernard was entitled to the estate, subject to trust. If he is found on remand to be disqualified from inheritance, he is not entitled to any benefits from the estate, but instead takes his interest as a constructive trustee. *Will of Wilson,* *supra,* 5 Wis.2d at 183. That constructive trust is imposed on the beneficiary regardless of any express trust established under the will. The question of who benefits from the constructive trust was also addressed in *Will of Wilson.*

The court in *Will of Wilson* stated:

"We consider that, in the case where a will bequeaths the residue of an estate to a legatee who has murdered the testator and an alternate legatee not related to the murderer is named to take in the event the primary legatee predeceases the testator, a constructive trust should be imposed under which the alternate beneficiary would take the bequeathed residue as the cestui of such trust. This is because such disposition is more in keeping with the expressed intent of the testator than would be a disposition which handed the estate over to the heirs of the deceased.

"The situation in the instant case is complicated by the fact that the named alternate legatees are the adult children of the murdered husband by a prior marriage. Mr. and Mrs. Wilson were married in December, 1953, after a very short courtship, and the will of testatrix was executed approximately a month after the marriage. On the record before us it does not appear how long she had known the alternate legatees or whether she had any particular attachment for them. The lawyer scrivener of the will testified to a conversation with the deceased in which she expressed antipathy against her two sisters.

"In determining who should be held to be the cestuis of the constructive trust, the question to be resolved is how the wishes of the testatrix would best be carried out un-

der the fact situation which has resulted from the murder. To properly decide such issue in our opinion will require the taking of further testimony by the trial court." *Will of Wilson, supra,* 5 Wis.2d at 187–188.

The court specifically limited constructive trust beneficiaries to alternate legatees *not related to the murderer.* In reaching that conclusion the court relied on the concurring opinion of Judge Fee in *Beck v. Downey,* 198 Fed.2d 626, 628 (9th Cir 1952), stating:

"If judicial policy dictates that he [the murderer] cannot take directly, no technical consistency should permit him to benefit indirectly by a gift to his family, especially a mother, from whom he would normally acquire property by the statutes of descent and distribution. The policy is pronounced that neither he nor any who takes through him or for his benefit should be recognized." Quoted from *Will of Wilson, supra,* 5 Wis.2d at 186.

The rule that persons directly related to the murderer are disqualified with him, is premised on the indirect benefits that would thereby flow to the murderer himself. Although we do not foreclose the possibility that the rule would not be applied in every situation, we consider the interests of children neither born nor conceived to be too remote to consider an exception under the facts of this case.

In the event that Bernard Safran is found to be disqualified the unborn children must be disqualified with him, and the named beneficiary, Roman Saffron, must take the estate as *cestui* of the constructive trust, in accordance with the stipulation among him and the Gedlen brothers. Because neither Bernard nor the unborn children would be entitled to take any part of the estate, the two-thirds of the estate immediately due to Bernard and the final one-third due upon his thirty-fifth birthday, become subject to the constructive trust and immediately payable to the alternate beneficiaries.

The second problem referred to above concerns the court's order authorizing payments for the testamentary trust to the disqualified beneficiary to prevent his becoming a public ward.

We have found no authority supporting that order, and hold that where a beneficiary is disqualified under the test set out above, he is wholly disqualified from receiving any benefit under the constructive trust imposed upon him.

Finally, the court held that the right of survivorship in property held jointly by Bernard and his mother was terminated at the time of Mrs. Safran's death and ordered that the joint property be divided equally between Mrs. Safran's estate and Bernard as of that date.

We believe that order was correct. In so holding, we adopt the dissenting opinion in *Estate of King, supra,* 261 Wis. at 274–276. The dissenters in *Estate of King* concluded that jointly held property should be divided and distributed equally between the murdering tenant and the estate of the deceased tenant, stating that that result:

". . . is the most equitable and can be justified upon the theory that the murder operates as a severance of the joint tenancy resulting in a tenancy in common whereby the murderer retains ownership to an undivided one-half interest, but gains no title in, or enjoyment of, the other half, which other half vests in the heirs at law and next of kin of the murdered joint tenant." *Estate of King, supra,* 261 Wis. at 274–275.

*By the Court.*—That part of the order of the trial court disposing of property jointly held by Bernard Safran and Mrs. Safran is affirmed. That part of the order disposing of the remainder of the estate is reversed and the cause remanded to the circuit court for Milwaukee county for further proceedings not inconsistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). I join the court's opinion. Unless the beneficiary is convicted of first-degree murder, in which case *Will of Wilson,* 5 Wis.2d 178, 92 N.W.2d 282 (1958), effects an automatic disqualification, the determination of whether the beneficiary had intent to kill must be made in a civil proceeding. *Supra,* p. 98.

I concur, however, in the dissent's interpretation of *Hart v. State,* 75 Wis.2d 371, 249 N.W.2d 810 (1977), and of sec. 940.06, Stats. 1975.[1] A conviction under sec. 940.06, Stats., cannot rest solely on inadvertence; a subjective realization (or sometimes referred to in *Hart* as subjective intent) is required.[2] I do not, however, agree with the dissent that a conviction under sec. 940.06, Stats., results in an automatic disqualification under *Will of Wilson.* While a conviction of homicide by reckless conduct may in some cases involve facts showing an intent to kill, a conviction under sec. 940.06, although requiring proof of facts showing a subjective realization or intent, does not necessarily always involve an intent to kill as that phrase is used in *Will of Wilson.* Thus when an individual is convicted under sec. 940.06, Stats., an independent determination that the beneficiary had the disqualifying intent to kill must be made in the civil proceeding. The conviction itself guarantees neither that the defendant had an intent to kill nor that he did not.

While I would retain the disqualification of persons who intend to kill as set forth in *Will of Wilson,* I would not have the court extend the reach of the rule any further. Any extension is for the legislature, not the court.

---

[1] The dissent correctly notes that the majority has not withdrawn the language in *Hart* stating that a subjective realization is required.

[2] *Jorgenson v. Chicago & N.W. Ry.,* 153 Wis. 108, 116, 140 N.W. 1088 (1913).

WILLIAM G. CALLOW, J. (*dissenting*). The issue in this case presents a problem of first impression for this court and therefore requires that we adopt one of several alternative positions. The majority concludes that committing homicide by reckless conduct does not disqualify the killer from inheriting from the victim. I respectfully dissent because I believe that crimes against life are so offensive to society that public policy dictates that no inheritance should flow from the victim to the killer, except perhaps in those cases where the victim's death resulted from a negligently homicidal act of the offender under secs. 940.07, 940.08, or 940.09, Stats. I recognize a great distinction between gross negligence and negligence, and I believe this court and the legislature over the years have accorded gross negligence a meaning embracing the elements of subjective intent, subjective realization, and willful conduct. Therefore, the character of Bernard Safran's crime—a violation of sec. 940.06, Stats., 1975, a crime encompassing all of the elements of gross negligence in the criminal law of Wisconsin—disqualifies him from inheriting under the common law of this state which prohibits inheritance by one who kills the testator.

I conclude the majority draws the distinction between the statutes dealing with homicide in the wrong place. The acts prohibited by secs. 940.01 through 940.06, Stats., generally recognize and require the existence of a mental state evincing an intentional disregard for human life. Only the acts prohibited by secs. 940.07 through 940.09, Stats., speak to negligent conduct. In *Hart v. State,* 75 Wis.2d 371, 249 N.W.2d 810 (1977), our most recent pronouncement on the subject, this court said:

"Gross negligence (which is now incorporated in sec. 940.06, Stats., Homicide by Reckless Conduct) requires a subjective intent as an element of the offense. In

*Bussard* and *Clemens,* the court used the following definition of gross negligence from *Jorgenson v. Chicago & N.W. Ry.,* 153 Wis. 108, 116, 140 N.W. 1088 (1913):

" '. . . Gross negligence has received a very certain and definite meaning in the jurisprudence of this state . . . . It is not inadvertence in any degree; there must be present either wilful intent to injure or that wanton and reckless disregard of the rights of others and the consequences of the act to himself as well as to others which the law deems equivalent to an intent to injure.' " *Id.* at 380.

The majority now withdraws the language of *Hart v. State* which determined that reckless homicide "requires a subjective intent as an element of the offense." The court does not withdraw the language of *Hart* which states gross negligence requires some subjective realization on the part of the defendant. The majority notes that under the Uniform Probate Code, adopted by thirteen states, one will not inherit if he feloniously and intentionally kills the decedent, but this prohibition excludes accidental manslaughter. There is nothing about accidental conduct in 940.06, Stats., 1975. Professor John Wade in his model statute, *Acquisition of Property by Wilfully Killing Another—A Statutory Solution,* 49 Harv. L. Rev. 715 (1936), disqualifies a "slayer" and defines a slayer as "[a]ny person who wilfully and unlawfully takes or procures to be taken the life of another." *Id.* at 721–22. That is precisely the conduct I believe sec. 940.06 prohibits.

*Jorgenson v. Chicago & N.W. Ry. Co.,* 153 Wis. 108, 116, 140 N.W. 1088 (1913), speaks of gross negligence as something different from a high degree of negligence and identifies that difference by defining gross negligence in terms of "wilful intent" and "wanton and reckless disregard of the rights of others." In sec. 940.06, Stats., the legislature specifically defines reckless con-

duct as an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and went on to state that it intended the definition to embrace all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin. While the original determination of what constituted gross negligence was set forth in a civil case, this court said in *Bussard v. State,* 233 Wis. 11, 13, 288 N.W. 187 (1939), a criminal case, "we must assume that the legislature, in adopting the amendment of 1929, used the term 'gross negligence' in that sense." That "sense" refers to the *Jorgenson* case definition of gross negligence.

I believe the majority in its effort to find a solution to the peculiar problem presented here does serious damage to the legislative commands of the unambiguous language of sec. 940.06, Stats., when it withdraws the language of *Hart* defining gross negligence as requiring subjective intent. After disavowing the definition of gross negligence in *Hart,* the majority elects to adopt the language of *Hayzes v. State,* 64 Wis.2d 189, 198, 218 N.W.2d 717 (1974), identifying this violation of sec. 940.06 as a degree of negligent homicide and declaring that the gross negligence requirement of sec. 940.06 is met "where the death was caused without the intent to commit bodily harm, but the conduct of the actor was such that there was a high probability that someone would be killed or injured." This treatment of gross negligence seems to return to the culpable negligence rule which this court found objectionable in the *Bussard* case—objectionable to the point that it suggested (and the legislature obliged) the legislature adopt the gross negligence standard which the majority now abandons.

Since negligence is a stated element of secs. 940.07, 940.08, and 940.09, Stats., I would separate them from

the more serious crimes prohibited by secs. 940.01 through 940.06, Stats. These more serious crimes bear the element of intent or subjective intent or subjective realization that a result will occur which will cause death or a high probability of death.

The trial court and the majority correctly observed that Wisconsin has no statute on disqualification by reason of manslaughter or negligent homicide. This court, in a line of cases cited by the majority, has reiterated its firm commitment to the principle that a murderer or slayer will not be permitted to profit by his crime. Because I equate homicide by reckless conduct with conduct involving intent rather than negligence, I would include homicide by reckless conduct with those acts that disqualify a person from profiting or inheriting as a result of his crime.

I therefore conclude that this crime, under the common law of Wisconsin, disqualifies Bernard Safran, Jr., from inheriting the property of his mother—his victim. The public policy principle that no one should be permitted to profit by his own wrong has been said to be as old as equity itself. It has survived through the years because it is a just policy that can be expected to produce a just result.

The second question to be resolved is whether a judgment of conviction following a plea of no contest is admissible in the probate proceeding to conclusively prove disqualification.

The majority notes, citing *Will of Wilson*, 5 Wis.2d 178, 92 N.W.2d 282 (1958), that this court implicitly recognized an exception to the exclusionary rule regarding admissibility in the probate court where a judgment of conviction in the criminal court represents each of the elements of the disqualification test—that one intentionally and unlawfully killed the testator. I believe we are

here confronted with the same proposition. Is the question to be answered in the probate court the same as that answered in the criminal court? My reasoning that Bernard Safran's conviction of violating sec. 940.06, Stats., 1975, disqualified him from inheriting under the common law of Wisconsin brings me to the inescapable conclusion that, as in *Will of Wilson*, the criminal court has answered the question which controls the result in the probate court, and therefore the judgment of conviction is admissible under the exception to the exclusionary rule.

Because I find Bernard Safran disqualified from inheriting, it is necessary to note that I agree with the majority in its conclusion concerning the ultimate disposition of the estate upon Bernard Safran's disqualification. The majority notes the interests of children neither born nor conceived as being too remote. I would add that the interests of any child adopted by Bernard Safran subsequent to the killing would also be too remote.

I am authorized to state that Justice John L. Coffey joins in this dissenting opinion.